Green vs. Warden Hooks. Mr. Williams. Good morning, Your Honors. May it please the Court, my name is Mario Williams and I'm here representing the appellant Darius Green. Your Honor, I did want to take 30 seconds to acknowledge a former colleague of mine, Michelle Hirsch, who was the lawyer on this case. She unfortunately passed away and I just wanted to say that she was a very great attribute to the state of Georgia Bar. That said, Your Honor, I stand by my brief. I took 10 minutes. I would like to go directly into answering questions. If you would like me to start off, would I believe the deliberate indifference claim I can? Start off however you'd like. Okay. I will. I'll start off with deliberate indifference. The first thing that I would like to point out is to cite the DeShaney case, the Supreme Court precedent, which says emphatically that there is a special relationship between a prison system and inmates and the appellees in this case have assumed a care and custody for the inmates in their jurisdiction. And that relationship means that those under that assumption of care and custody have to take reasonable measures to protect an inmate from harm if they know about it. So let's talk about the standard because the standard is very important. Mr. Williams, as I understand the Georgia system, they have an institution in which they do major classification and they interrogate the potential inmate and then they classify to another institution and they get there and there's further processing of the inmate. My understanding is that . . . That is correct, Your Honor. Is that nothing is awry in the first situation from what she said to the authorities and the second place? And so now she's put into the population. And so when is it that the warden has notice? And that's a great question. Because it gets to a serious issue in this case of a missing document. The way this process works based on the evidence at hand is that Darius Green arrived at Rogers State Prison. The appellee Brown said, hey, the normal process is a couple of hours and then you go into general population. In this case, Darius Green, a transgender who had been on hormone therapy for numerous years prior to getting put at Rogers State Prison, was put in administrative segregation. Upon arrival, Darius Green was strip searched, had breasts, was issued a bra at the prison before and then was placed in administrative segregation. So what's the point? To answer your question directly, there is an assignment memo by policy that must be filled out. On that assignment memo, it says reason why placed in segregation. That assignment memo has gone missing. I have not said that it was deliberately destroyed, but the fact of the matter is it's missing. That assignment memo is signed by the warden, appellee Hooks, or the warden's designee. But what do we know on record? We know first and foremost that twice Darius Green was put in administrative segregation. The second time Darius Green was put in administrative segregation, warden Hooks signed the assignment memo. So we believe that there is a tribal issue of material fact as to first why Darius Green, a transgender who was issued a bra, who had breasts, who was strip searched and placed out of the normal custom in administrative segregation. We believe there is a tribal issue for fact for a jury to determine was that warden Hooks' first knowledge that Darius Green was transgender. And, and this is where the standard comes into play. The standard is, are the appellees aware of facts from which an inference can be drawn that there was a risk of serious harm to Darius Green? Aware of facts. But doesn't the Farmer case sort of give you a problem there? I mean, isn't, doesn't that case sort of establish that the mere fact that a person is transgender does not automatically impart knowledge of danger to that specific person? Thank you, Judge Rosenbaum. I'm glad you asked that question. And to answer you directly, it would present a problem if that's the only facts we had. So this is a totality of circumstances the way you look at this evidence. So we have a tribal issue first on, let's view on the facts favorable to us. Warden Hooks signed an assignment memo. Darius Green, a transgender, who came over with her file as a transgender, was placed in segregation, not like the rest of everybody who went to general population because he's transgender. But they also put her wherever she was based on what she communicated. And there's no evidence in the record that anything was communicated. She'd been incarcerated before, had she not? Yes. Okay. So she'd been incarcerated before and she went through two classifications. One in the initial institution and then at that prison. Well, at Georgia Diagnostic Classification Prison, she was in protective custody the entire time. Yeah. But the point I'm making is whether or not she was a risk, had suffered anything.  Well, I'm going to get to that point, Judge. My understanding is there's nothing was communicated at any step of the way. Not true. That's not what the record says. What is in the record? Okay. Wait a minute. Okay. What's in the record that indicates that she had been physically molested? That they know that when she was first considered for assignment, that's in the first institution. And then when they, knowing that, they sent her to this prison, an all-male prison. Do you understand me? The standard doesn't... I want to know what is in the record that she told the first institution when they were classifying. Something that mean they should not have sent her to the second one. That's not our case, Judge.  Yeah, there is something in the record. Okay. Then they shouldn't have sent her there in the first place. I agree with that completely. Okay. What is in the record which indicates that in the first place? She went to a prison, Rogers State Prison houses medium and maximum security inmates. She was low-level security. I don't think she should have been there in the first place. Okay. What is in the record? That is in the record. Tell me what... That she was a minimum security inmate that was put into a medium closed security prison. But Judge, because I'm just running out of time, I just want to say this. Our facts are that if you give us that warden had knowledge, the memo's gone, so there's a tribal issue of fact. Her mother called the Department of Corrections. What happened after the warden interrogated her following the mother's call, the second call? Okay. The warden sent her back to general population? No, no. What did she tell the warden about danger or anything else? She said she was okay. There is a duty on the warden. Our expert testified in this case and gave a report that said, hey look, in prison, and the warden acknowledged this because he sent her back with a letter saying, I'm going to send you back with a letter because I don't want you to be designated as a snitch and possibly lose your life. Identifying an inmate by name and getting that inmate in trouble puts your life at risk in institutions such as this. So her saying I'm okay does not, under the totality of circumstances, negate the facts that the warden was aware of. The testimony and facts demonstrate that the mother called the Department of Corrections. When I asked Warden Hooks, did you get a phone call about Darius Green being a transgender? Possibly. Okay. Did the mother call you? Yes. Did she send the letter over? I'm not sure. No, I don't remember reading. The mother testified she sent the letter to Warden Hooks, but more than that, he was told, I received a letter. My son is transgender. The letter says she's in great danger, fear for life, could be killed or seriously injured, needs an immediate transfer. That and Warden Hooks' testimony really puts this at case for a trial because he said, when I asked, hey, why did you the second time send Darius Green when you knew she was in fear? And that assignment memo says that back to general population. You know what he said? He said, because I can't protect you from somebody, and the district court adopted this philosophy essentially, if I don't know who it is, that's unlawful. Hale case, Farmer case says that's unlawful. It may be a factor in the totality of circumstances under consideration and facts, but it can't be the dispositive issue, and he made it the dispositive issue. There are tons of facts on record that he was aware of. You can draw an inference and say that Darius Green was at risk. But Darius Green specifically told the warden, I'm not in danger. It'd be one thing if Darius Green had said, I'm in danger, but I can't name the person. Which seems to be what you are arguing, but in this case, told the warden, there's no danger. Well, told the warden, I'm okay, and I asked the warden and the deputy warden security of Brown, said, hey, is that normal? Have you had a situation where someone says, hey, I'm fine, but you know they're not fine? Yes. That is prison culture. My understanding is they had a conversation that lasted about a half hour. More reason why you should have taken reasonable steps, because during that conversation, the mother saying, look, I got the letter. The evidence... Talked about with her for a half hour. No. No. It was the mother was on the phone. The way that conversation worked was the mother was on the phone, Darius Green was present, talking to the mother, the talking to the warden and deputy warden Brown. But the point is, is this is a totality. You can't say in a prison environment, I'm over, can I take 30 seconds, or do you want me to say this? No, no. Go ahead and finish. Okay. In a prison environment, you can't say, hey, I get this information. You're a recognized, identifiable member of a vulnerable group. That's farmer. That put them on fair warning about transgenders. And I get this information about you fearing for your life. I know what dorm you're in. I know the head of the dorm, and I'm going to negate all that information because you, in a prison environment, knowing snitch culture, say, I'm okay. That's not the test. The test is were you aware of facts that where inference was drawn from those facts that a risk of harm was placed to Dash Green. And we have a total amount of facts that a jury could conclude that. Your argument then is that a transgender or somebody's homosexual, because of the reasons you just articulated, needs to be put into administrative segregation. To escape liability, as a matter of course, single cell, single cell administrative liability. As a matter of course, to escape liability when you get information that a person is You just know that they are homosexual or transgender, and it's an all-male institution like this one is. Administrative segregation. No, that's not our argument. One person's cell. That's not our argument. Our argument is much more specific than that because the warden had facts that said that this particular person would fear for their life. No, no, no, no, no, no, no. What I'm saying is you've just said that a person and her situation is never going to give the warden appropriate facts. That's not what I said. I said she didn't. I don't know if a person, a different transgender would do it or not, but I know she said she was okay, and I know that's a part of principle. No, no, no, but you want us to understand that somebody and her situation is going to fabricate the truth. Well, I'm going to say Either that or that is not going to come forward. I'm going to say that when you have information that a transgender inmate credibly fears for their life, and you receive that information, and you know that person is part of an identifiable vulnerable group, you need to take reasonable steps to protect them, which would mean administrative segregation. You save some rebuttal time, Mr. Williams. Okay. Thanks. Mr. Pinson. Thank you, Your Honor, and may it please the Court. There are many potential distractions in this case, but focusing on the relevant legal standard and the actual record in the case makes clear that Green's claims here can't survive summary judgment. I have one concern. There are two letters that Green wrote, and the second letter in particular, she articulates, she says that in the second letter, she said that Ricard is molesting me sexually. He's requiring me to perform moral sex on him, etc. And so, if that letter had been received by any of the defendants, would you agree then that they would be put on specific notice, and that they then would have an obligation to take protective steps? Your Honor, I think that if it were actually in the record that a defendant had read the I agree. Here's my concern. In this case, it seems like the district court did not credit the idea that Green sent the letter, and since she sent it on the 17th, and the incident occurred on the 21st, and it was sent to Brown, I think with respect to Hooks and the warden, the warden and the other defendant, Grubbs, this is not an issue. But with respect to Brown, I mean, she said she put it in the prison mailbox, and so then it becomes an issue of fact. He said he didn't receive it, but we generally would imagine that once it's put into the mailbox, there is a presumption of receipt. And so maybe it seems to me that there is a genuine issue of fact as to whether or not it was received. My understanding is that the district court did not credit this because it said, well, you know, if I do this, then any time a case like this comes up, a prisoner can always say I put a letter in the box, and then we've got a problem. But our jurisprudence in this circuit is that there's not some unique presumption with respect to statements that are made by prisoners versus other litigants. So why isn't that something that we should send back and have the district court conduct a hearing of some type in order to determine, make a factual finding as to whether or not Brown received the letter? Your Honor, a few responses to that. First of all, I don't think it's accurate to characterize the district court as not  reading the letter. The district court does say, you know, even if we credit this assertion. But I think you have to back up and ask what is the fact that we're talking about here? The question of fact that is material is whether Brown not only received but read that letter. And you have undisputed testimony from Brown that he did not, direct evidence that Brown did not read that letter. But why isn't there a question of fact as to whether or not he did? I mean, the question of fact being, let's say that he did receive the letter, right? He says he didn't receive it. But let's say he did receive the letter. I mean, any time, it seems like you have the exact same problem with respect to not believing, it seems like you have the exact same problem with the prisoner as you would with Brown, right? Which is, if you're always going to choose to believe the prison employee, right, then what you're doing is you are creating a situation where the word of the prisoner is not considered or evaluated in the same way as the word is the prison employee. I mean, once she says she sends it in the prison mailbox, there is a presumption that he receives it. And it may well be the case that he didn't. I'm not suggesting that he's, I'm not saying that he lied. I'm just saying it seems like there's a material issue of fact here as to whether he actually received it. And if he did receive it, I think he had an obligation to read it. Your Honor, I disagree that this is a sort of credibility fight. On one hand, you have Brown saying he did not receive or read the letter. On the other hand, you have, and we do credit, I think, at the summary judgment stage that Green wrote the letter and put it in the prison mailbox. I'm not aware of a presumption, and you let me know, but I'm not aware of a presumption that an internal prison mailbox, that when you put it in there, it gets to. What does the record show as to this, the mailing system? As if, for example, if you were going to replicate the U.S. Postal Service, you'd put in all the evidence of what happens to things. What is there in the record about this mailbox, how it operates and all those sorts of things? Not much that I'm aware of. Do we know anything more than a, quote, mailbox, do we know where it's located? There's a prison dropbox in a hallway. It is a dropbox in a hallway that prisoners can put things in. That's right. And what is the evidence as to how frequently the dropbox is examined and who looks at it and so forth? What's the delivery system? I didn't see anything in the depositions that I read that suggests what happens. Is there anything in the regulations? I'm not aware of specific regulations about this internal mailbox, but what I will say is that it is Green's burden to show that that letter got to Brown. Well, if we were dealing with the United States Mail Service and it was proven that something was mailed to somebody, then you could draw an inference that they didn't do anything in response to whatever the so-called letter said. Your Honor, I think that it could be different if someone had a certified mail receipt and the delivery receipt showing that it was delivered to the person. We don't have that here. You don't even need a certified mail receipt in the regular mail, right? I mean, just simply saying in a declaration or an affidavit, I put this in the mailbox in the U.S. Mail, that's enough for the presumption to kick in. I think that may be enough, but it's not necessarily true here. And because of that, it requires a significant inferential leap to get... What does the record show as to her interaction with Brown? Her interaction? I mean, a possible interaction, both before and after that letter. The only interaction with Brown that I'm aware of in the record is that Brown was at that meeting with the warden. Okay. Was anything said at the meeting about the letter? No. The letter was written before that? The letter from Greene to her mother was written before that. I understand, but the letter in the drop box was before or after the meeting? After. The meeting was on August 28th and Greene asserts that she sent the letter on September 17th. And then she wound up in administrative segregation not long after that, wasn't it? On the 21st, on the Friday of that week. Of that same week? How many days between the drop box of the letter and administrative segregation? The drop box, she asserts that she put it in the drop box on the 17th of September and then was put in administrative segregation on the 21st. On the 21st. So we're talking about four days. That's right. But once she was... The problem is that once she was put into administrative segregation, she was put in with Rickard, the very person she complained about in the second letter. And that was where the problem arose, right? Your Honor, yes. The assault that's in the record between Rickard and Greene occurred in administrative segregation. But again, I think I want to make very clear that this is not the kind of case where you have simply a he said, she said debate that is ripe for trial. You have direct evidence from Brown that he never read the letter. You have, at best, circumstantial evidence from Greene that she sent the letter, that she put it in the mailbox. Why is it circumstantial evidence? I mean, we just had in it was a tax case, but still a tax case that we heard on Bonk where we said, if you say it in an affidavit and there's nothing to contradict it, then for purposes of summary judgment, that is a fact that we take into account. So why is it just circumstantial? Your Honor, it's circumstantial evidence because, again, the fact that matters here is whether Brown read that letter and became aware. But what's circumstantial about her having put it in the mailbox? Her having put it in the mailbox is circumstantial evidence that she is using. It's actual evidence that it was put in the box. You have to draw the inference that somebody picked it out of the box and gave it to Brown. Either Brown emptied the box himself as a matter of routine or somebody else, as a matter of routine, emptied the box and delivered what was in there to whoever it was addressed. That's right, Your Honor. That's the inference Judge Rosenbaum is talking about. And the inference is more than... And then there's a second inference, which is that he did nothing about it. Right, that he read the letter and then did nothing about it. Yeah, read the letter and did nothing. Right. There's a chain of inferences that you have to draw. That's right. That's right. The direct evidence... That's why I asked the questions about whether you have regulations in the system that say you empty these boxes every six hours or some such thing and a certain person does that, a designated person, and then they are taken to the addressee. As if it were a U.S. mail service. Correct, Your Honor. And I'm not aware of anything in that record that shows that. And it is... But, I mean, in four days, in a four-day period though, right, I mean, wouldn't it be fair to expect that what's put in the mailbox inside a single institution, a prison, would make its way to whoever it's addressed to? I mean, the U.S. Postal Service gets things there in three days. So... And it's the whole country. So wouldn't you expect that if something had been put in the mailbox, that we could expect it to arrive at its addressee within four days? Your Honor, there's nothing in the record that allows that assertion to be anything more than speculation at this point. If there was something in the record that made clear that when things are put in this a closer question. But given that all you have is Greene's assertion that she wrote the letter and dropped it in the mailbox, and she admits she never saw the letter again after that and has no idea what happened to it. Well, she didn't get it back. She didn't get it back, but... Isn't there an inference there that it went somewhere other than to her? I mean, unless it's wedged in the box still. Again, Your Honor, I'm not sure that the inference at that point is much different from speculation. If somebody would give it back, that would be... And that's an inference that's hard to draw. Right. That somebody would give it back. Right. And Your Honor, I would add that the record is full of instances where when inmates did have complaints and they brought them to prison officials, those complaints were dealt with. Well, there's no question she had opportunity to complain to lots of people, verbally. Your Honor, there's no question about that, including verbally and independent of Daryl Ricard being around her. She admits that she went to medical several times during the time where she was... Well, there are... The testimony is that she had problems with him, but way before the administrative segregation. Your Honor, that's correct. Let me just say, I agree that up until that time, there are some serious problems with her case, but it seems to me like there might still be an issue of fact that's created by the sending of this letter. And I just wanted you to have an opportunity to address that. Right. And Your Honor, the last thing I'd say about that is there are a couple cases that sort of make this point about judging circumstantial evidence and inferences against the direct evidence about reading it. One is the Bald Mountain case that we cite in our brief, where the court specifically says when you have positive uncontroverted evidence of the absence of a fact, circumstantial evidence from which an inference can be drawn, but it's not demanded, can't trump that direct evidence. I think that this is a similar case. Although clearly, if you had the exact same situation and it were outside of the jail, there would certainly be a question of fact, because there is a presumption under the U.S. Then you would certainly have a question of fact. So the only reason why there may not be a question of fact here is because it's a prison mail system. I don't know that that's the only reason. It is a reason. I agree that the prison— But would you agree that if you were outside of the prison setting and you had the same situation where a letter is dropped in the mail and four days go by, that there would be a presumption that the person would have received it even if they testified or swore in an affidavit that they did not? Your Honor, I think it's at least a closer question given the regularity of the U.S. Postal Service. But this is not a U.S. Postal Service mailbox. It's an internal mailbox. We know what the words of the letter were specifically. No. There's nothing about the letter in the record. And that was the point— Well, actually, doesn't she say in the record that what she said was that Mr. Ricard was making her perform oral sex on him? I mean, that seems pretty specific to me. Your Honor, I was just saying that the letter is not in the record. It is true that that is in the record. That was my question. I don't think it's summary judgment. She described some kind of activity. That's right, Your Honor. The one other thing I'd say about that is that if the link, Judge Rosenbaum, that you're trying to draw is between receipt of this letter by Brown and the events in the administrative segregation, there's no evidence in this record that Brown or Hooks or Grubbs were responsible for that placement into administrative segregation. What was Brown's involvement specifically in the administrative segregation? I'm not aware of any. Right. But the problem—I'm sorry. Go ahead, Judge. Once more, the letter was written after administrative segregation? The letter was written after the meeting with Brown. After the meeting and before administrative segregation? That's right, Your Honor. Okay. What was Brown's involvement in the administrative segregation? The record doesn't show that he had involvement in that. But the problem— Well, whoever—well, some correctional officer put the four of them in segregation. Lieutenant Grubbs, who is one of the defendants in this case, ordered them to be sent to administrative segregation but did not put them in those particular cells. Well, presumably, Brown would have told him about the problem in placing regard in with the three of them. It is Brown's testimony that had he received such a letter that he would have acted on it, right? He would have prevented the administrative segregation with all four. Well, that he would have reacted to the letter, which in effect would have said—would have made sure that he was not with him. The criminal charges brought. Right. Probably. Okay. I think we have your case. Thank you, Your Honor. Mr. Williams. I just want to clarify something for you, Honorable Judge Jofet. When you talk about what is Brown's knowledge about administrative segregation, he was referring to the first time. The testimony of Brown for the first—I mean the second time. The first time, Brown testified that it would have been him or Warden Hooks that would have signed the assignment memo that would have stated the reason why he was placed in administrative segregation. The second fact I want to clarify is that Tory Grubbs did assign them to the same administrative segregation protective custody cell, and that is the testimony and the documented evidence demonstrates that. And then Warden Hooks signed the assignment memo, and he also checked off the box sending Darius Green back to general population, but then the rape occurred. So but what I'm more fearful of is the idea that when you receive the direct information in the letter from Darius Green's mother, that she feared for her life, that everyone seems to almost—and I hope that this isn't the case—say, okay, the standard is, are you aware of facts from an inference of risk to Darius Green? Aware of facts. That is not negated because Darius Green in a prison setting as a transgender says, hey, I'm sorry, I'm okay. And if that were the case, why did Warden Hooks send Darius Green back to general population with a letter and said, I want to protect you from becoming a snitch? Because in prison, if you identify somebody, you can lose your life. Our expert wrote an opinion testified to this, said, hey, look. That's common sense. We can almost take it as— Okay. And so you shouldn't just say—and the law is on the side of that. The law says, hey, it is not dispositive in a case of failure to protect that the inmate does not identify the assailant. That is the law, and that is exactly what Hooks did. He said, and I quote— She doesn't feel like she's in danger at all. But she said, I'm okay. Right. And that's— After—but that is prison culture. There's a— I understand. I understand that it is prison culture. I don't disagree with you, but— But I want to rely on law, not just empathy or sympathy. The law says there is a special relationship between a warden and the inmate that is under his care and custody. That goes beyond in a prison culture an inmate saying, I'm okay, when you have all these other facts that says you're not okay. Or better yet, to be more specific about the law, you have a set of facts that says you could be at risk of serious harm. That's the law. The law is, do you have—are you aware of facts that an inference is drawn that you are at risk? Not that you are in serious danger. You're at risk of serious harm. You had a transgender whose mother called DOC, who didn't—wait, I'm going to get off kilter before I forget this. The testimony that Brown said, hey, if I would have got the letter, I would have acted on it. Read the deposition, and I'll supplement the record with this if need be, because I don't have it in front of me. But I'm almost positive when I asked him the initial time, hey, are you 100 percent certain you didn't read that letter? He said, I can't say for sure. And then he came back and said, but I know if I would have read it, I would have acted, so therefore, I didn't read it. But going back to aware of facts, because this is important, you cannot, in a prison setting, negate that by her saying, I'm okay, because she doesn't want to identify somebody. Point number two, and I know I've driven, beaten it up, I have one more minute, is you also have to take in the fact that the material evidence on record is that Hooks did not care about anything other than identifying the inmate, which is unlawful. He says, hey, I sent her back the second time to general population, because there she goes again. I can't protect you from somebody who I don't know the identity of. There is a tribal issue of material fact for a jury to resolve that could easily conclude, hey, you knew there was a risk of harm, but because she didn't identify, and you made that a dispositive issue, who she was at risk of, you went ahead and negated all the facts that you were aware of to take reasonable steps to protect her. So the mere fact that the warden received a call from her mother, regardless of what that phone call from the mother should have put her into administrative segregation. It's not the mere fact. It's the fact that the warden, under the standard of review, understood that Darish Green was a vulnerable inmate because he segregated her the first time when he didn't have any evidence. And then when Green's mother gave him the facts, that she was in danger, that she wrote the letter, who Green's mother said, I sent the letter over to the warden, so we have another issue, such as Judge Rosabond said, of whether he read it or not, then on top of taking measures when there was no evidence, just the transgender status of segregating her for nearly a week when she first got to the prison, then you add the specific evidence of a letter saying, I'm in great danger, I'm about to be killed, I need an immediate transfer, and you're going to negate all that because in prison culture, somebody doesn't want to identify the assailant and says, I'm OK. You can't do that. That's not the law. That is a tribal issue, a material fact, as to whether or not these defendants were aware of facts and drew the inference that a risk was posed to a transgender inmate when specific facts said that her life was in danger. That's all I have. Thank you. Court will be in recess until tomorrow morning at 9 o'clock.